In the Matter of the Worker's Compensation Claim of: Tim **IKENBERRY,** Appellant (Employee–Claimant),

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' COMPENSATION DIVISION, Appellee (Objector–Defendant).**

No. 99–250.

Supreme Court of Wyoming.

May 3, 2000.

Representing Appellant: William M. Mac-Pherson, MacPherson Law Offices, LLC, Rawlins, WY. Argument presented by Mr. MacPherson.

Representing Appellee: Gay Woodhouse, Attorney General; John W. Renneisen, Deputy Attorney General; and Elizabeth C. Teigen, Assistant Attorney General. Argument presented by Ms. Teigen.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

HILL, Justice.

Appellant, Tim Ikenberry, seeks review of an order of the Office of Administrative Hearings denying his claim for worker's compensation benefits. We determine that the order denying evidence is contrary to the great weight of the evidence and, hence, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. We reverse with directions that Ikenberry's claim for benefits be granted.

## ISSUES

Ikenberry advances these issues:

1. Was the Hearing Examiner's decision to deny benefits supported by substantial evidence?

A. Was the Hearing Examiner's finding that there were numerous inconsistencies in the evidence presented by the Employee supported by substantial evidence?

B. Did the Hearing Examiner improperly consider evidence unrelated to the Employee's injury?

2. If the Employee's injury arose out of and in the course of his employment, should benefits be denied because the Employee suffered from a preexisting condition?

The Appellee, Wyoming Workers' Safety and Compensation Division (Division), rephrases the issues thus:

The Hearing Examiner denied benefits as he found that Employee did not prove the causation element of his case. The Hearing Examiner found that Employee presented numerous inconsistencies. These inconsistencies caused the Hearing Examiner to find Employee's testimony 'questionable at best.'

A. Does substantial evidence support the Hearing Examiner's findings?

B. Does substantial evidence support a denial of benefits because of the Employee's pre-existing condition or should the Court remand the case to the Hearing Examiner for findings on the issue?

## FACTS

Ikenberry, who was thirty-eight years of age at the time of the injury in controversy, was living in Casper when this matter arose. Preliminary to qualifying for parole, he was residing at the Community Alternatives Cen-

ter (CAC) in a work release program. Ikenberry claimed to have been injured on March 15, 1998, while working at the Flying J Restaurant in Casper, when he slipped and twisted his back while lifting heavy mats out of a dishwasher. He first submitted a "Wyoming Report of Occupational Injury or Disease" on March 16, 1998. Ikenberry testified that he related the result of his accident (that his back ached) to Flossie Reeb (Reeb), his supervisor, shortly after the accident occurred. The day following the injury, Ikenberry formally reported the accident to Reeb, and she transcribed his oral description of the accident thus: "Was doing dish[es] that night said he had a back ache at end of night—had also complained of back ache the night before." The report indicated that Ikenberry's normal work hours were from 2:00 p.m. to 10:30 p.m. That report also answered the question, "Has employee been treated for this injury and/or condition before?" with a question mark (?) and noted, "When he went for drug test he was on Darvocet and muscle relaxers Norflex." In addition, there were no witnesses listed in the report. Ikenberry filed a second report on March 17, 1998, and he himself wrote the information on that report. That report indicated that his normal work hours were from 6:00 a.m. to 2:00 p.m.; made no mention of previous treatment for "this injury;" listed two witnesses to the accident, "Flossy" and "Kate," and described the accident thus: "Working in dish tank lifting heavy mats and lifting heavy tubs of dishes on slippery floor." In all other pertinent respects, the reports were about the same.

The day following the "accident," March 16, 1998, Ikenberry was in considerable pain and sought medical care. First, he went to a hospital emergency room, then to a chiropractor, and finally to Albert V. Metz, M.D. (Metz), a physician whose practice is limited to neurological surgery. On March 25, 1998, Metz performed surgery on Ikenberry to repair a large disc herniation which was of recent origin and which was the result of a material aggravation or an acute precipitation of the disc herniation at the time he lifted and twisted with the heavy mats. Ikenberry's complaints and his medical condition which required surgery were consistent with Dr. Metz's examination, the tests performed (MRI, etc.), the report made by Ikenberry, and Ikenberry's posture (bent over and in pain). Dr. Metz did note some degenerative changes at other disc levels in Ikenberry's back, but these were not unusual for a person who has done fairly active work. Dr. Metz also stated that he believed Ikenberry's complaints because his complaints and reports were sensible and consistent with the information he provided to Dr. Metz.

Ikenberry's claim for worker's compensation benefits was investigated, and ultimately the claim was denied on April 21, 1998, for the following reasons:

**Final Determination**

The Workers' Compensation Division has reviewed your accident report and medical records on 4/21/98, and has determined that we cannot approve payment of benefits for the following reason(s):

1) Definition of injury does not include: Any injury or **condition preexisting** at the time of employment with the employer against whom a claim is made. (Wyoming Statute 27–14–102(a)(xi)(f));

2) The **burden** is on the claimant to **prove each essential element** of his or her claim by a preponderance of the evidence;

3) The incident, as reported to the Division, **does not meet** the following definition: **"Injury"** means any harmful change in the human organism other than normal aging and includes damage to or loss of any artificial replacement or death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extrahazardous duties incident to the business. (Wyoming Statute 27–14–102(a)(xi));

4) Definition of injury does not include: Any injury resulting primarily from the **natural aging process or from the normal activities of day-to-day living**, as established by medical evidence supported by

objective findings. (Wyoming Statute 27–14–102(a)(xi)(G)). [Emphasis in original.]

The only conclusion that we can make from a reading of the letter denying benefits is that it was premised on a preexisting condition, the natural aging process, and normal activities of day-to-day living. The problem with those conclusions is that there was no evidence of record developed in the Division's investigation of Ikenberry's injury to support those conclusions. It is correct that Ikenberry had a preexisting condition, but that condition was in his neck, and Dr. Metz positively eliminated that as being related to the injury he corrected with the surgery (" ... obvious that these are totally unrelated things."). Dr. Metz characterized Ikenberry's back as showing only normal degeneration based on his work history (no mention is made of "the natural aging process"), and there is no evidence that the injury resulted from the normal activities of day-to-day living. No mention is made in the above-quoted letter of the issues that were advanced at the hearing held on this matter (lying, deceit, artifice, etc.). Indeed, we feel compelled to note that the above-quoted letter appeared to have been composed based on speculation that was unsupported by the only medical evidence available to the Division.

On May 14, 1998, Ikenberry filed a request for a hearing on the denial of his claim stating: "We are objecting on the grounds that we are denying that this is a preexisting injury." Thereafter, the wheels of justice turned somewhat slowly because Ikenberry was returned to the Wyoming State Penitentiary from CAC, and assigning the case from Natrona County to Carbon County took some time. Suffice it to say for purposes of this appeal, his hearing before the Office of Administrative Hearings did not take place until March 30, 1999, and the Hearing Examiner's order is dated April 29, 1999. On May 18, 1999, Ikenberry filed his petition for review in the district court, and the district court certified the matter to this Court pursuant to W.R.A.P 12 on August 23, 1999.

## STANDARD OF REVIEW

Our standard of review in a case such as this is well-established:

A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. *Martinez v. State ex rel. Wyoming Workers' Compensation Div.*, 917 P.2d 619, 621 (Wyo.1996). When an agency decides that the party charged with the burden of proof has failed to meet that burden, the case is reviewed under the "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" language of Wyo. Stat. § 16–3–114(c)(ii) (1990). *City of Casper v. Utech*, 895 P.2d 449, 452 (Wyo.1995). On appeal the complainant, Pederson in this instance, has the burden of proving arbitrary administrative action. *Knight v. Environmental Quality Council of State of Wyo.*, 805 P.2d 268 (Wyo.1991); *Wyoming Bancorporation v. Bonham*, 527 P.2d 432, 439 (Wyo. 1974); *Marathon Oil Co. v. Welch*, 379 P.2d 832, 836 (Wyo.1963); *Whitesides v. Council of City of Cheyenne*, 78 Wyo. 80, 319 P.2d 520, 526 (1957). The agency, as the trier of fact, is charged with weighing the evidence and determining the credibility of witnesses. *Utech*, 895 P.2d at 451, and cases there cited. The deference normally accorded to the findings of fact by a trial court is extended to the administrative agency, and the agency's decision as to the facts will not be overturned unless it is clearly contrary to the overwhelming weight of the evidence. *Wyoming Steel & Fab, Inc. v. Robles*, 882 P.2d 873, 875 (Wyo.1994). Demonstrating evidentiary contradictions in the record does not establish the irrationality of the ruling, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it. *Matter of Corman*, 909 P.2d 966, 971 (Wyo.1996); *Knight*, 805 P.2d at 274; *Ward v. Board of Trustees of Goshen County School Dist. No. 1*, 865 P.2d 618, 623 (Wyo.1993); *State ex rel. Wyoming Workers' Compensation Div. v. Ramsey*, 839 P.2d 936, 941 (Wyo. 1992).

*Claim of Pederson*, 939 P.2d 740, 742 (Wyo. 1997).

## DISCUSSION

■ In applying the standards set out above, we search the findings and conclusions of the Hearing Examiner, as well as the record, to determine whether the agency's decision is based upon a consideration of relevant factors and is rational. *Mortgage Guaranty Insurance Corporation v. Langdon,* 634 P.2d 509, 520 (Wyo.1981); *Burns v. State ex rel. Workers' Compensation Division,* 4 P.3d 924, 926 (Wyo.2000).

■ We also need to premise our discussion with an acknowledgment that all of the witnesses who testified, and all other evidence introduced at the hearing, clearly established that there were no "eye-witnesses" to Ikenberry's accident. At no time in his reports of the accident, in his narration of the accident to his treating physician, nor in his own live testimony at the hearing, did he make a claim that anyone saw the accident occur. The testimony of an injured worker alone is sufficient to prove an accident if there is nothing to impeach or discredit the worker's testimony and the worker's statements are corroborated by surrounding circumstances. *Duncan v. Hardware Mutual Casualty Company,* 275 So.2d 462, 463 (La.App.1973). Moreover, the occurrence of injuries resulting from accidents to which there are no eye-witnesses does not prevent fair inferences from being drawn and findings of facts from being made. *Bohan v. Lord & Keenan, Inc.,* 98 N.H. 144, 95 A.2d 786, 788 (1953).

We have set out below the contents of the Hearing Examiner's decision and will interlineate our comments on the findings and conclusions of the Hearing Examiner, as necessary. Before we set out on that task, we must delineate three additional components of the reasoning process we must employ in reaching a resolution of this case. First, if the evidence admitted into the record at the hearing is deemed to be credible, then Ikenberry is entitled to benefits. If the evidence is credible, then he has met his burden of proof by a preponderance of the evidence, and there is no meaningful evidence in conflict with it. *See In the Matter of Pino,* 996 P.2d 679, 685 (Wyo.2000); *Matter of Thomp-*

*son,* 966 P.2d 977, 980–81 (Wyo.1998); and *Forni v. Pathfinder Mines,* 834 P.2d 688, 693 (Wyo.1992). Second, the Hearing Examiner premised his Order Denying Benefits on "inconsistencies" in Ikenberry's reports and testimony. The word "inconsistency" applies to propositions that cannot both be true, and that term is inappropriate to characterize propositions of differing degrees of completeness. *State v. Jackson,* 162 Conn. 440, 294 A.2d 517, 524 (1972). This is especially true under these circumstances where over a year had passed since the accident occurred (and memories had faded) and, for example, times given were estimates. Third, we must be attentive to the concept of corroboration. "The theory of corroboration is that a statement which has been shown to be true in some respects is reasonably likely to be true in the remaining respects." *Jackson,* 294 A.2d at 522.

## *ORDER DENYING BENEFITS*

THIS MATTER came before the Office of Administrative Hearings (Office) on March 30, 1999, for evidentiary hearing. The Claimant (Ikenberry) appeared in person and by and through counsel, William M. MacPherson. The Employer, Flying J, did not participate. The Division appeared by and through counsel, David E. Erickson. Ikenberry's Exhibits A through J and the Division's Exhibits S–1 through S–3 were received into evidence at the hearing. The Office has considered the evidence and argument of the parties, and makes the following:

## *FINDINGS OF FACT*

1. The issue before this Office is whether Ikenberry suffered an injury to his back while employed at Flying J. Ikenberry argued he was pulling mats out of the dishwasher when he twisted his body, slipped on the wet floor, fell and caught himself on a cart. This either resulted in an acute injury or resulted in a material aggravation of a pre-existing degenerative condition. The Division argued Ikenberry's herniated disc was not the result of his

work effort at Flying J. Based upon the findings herein, this Office denies benefits.

This finding strongly suggests that the Division's only theory of this case was that Ikenberry did suffer an injury which would have been compensable, but for the fact that inconsistencies made Ikenberry's testimony and that of his physician insufficiently credible to sustain the burden of proof Ikenberry was required to meet.

2. Ikenberry is an inmate at the Wyoming State Penitentiary. He is currently serving time on a felony conviction for escape and has at least two prior felony convictions, one for escape and one for burglary. In early 1998, Ikenberry was on work release at Community Alternatives of Casper (CAC). Ikenberry testified he had been working on a drilling rig but quit because of 12 hour work days with three hours travel time each way.

■ Although this finding explains why Ikenberry began working at Flying J, it serves no apparent purpose with respect to his burden of proof in this case nor to his credibility as a witness. *See* Wyo. Stat. Ann. § 27–14–404(f)(LEXIS 1999). To the extent the Hearing Examiner may have relied on these facts in reaching his decision, we view that to be a consideration of an irrelevant factor and not rational in view of the issues to be decided, as set out in the opening paragraph of the Hearing Examiner's order.

3. Ikenberry applied for and was hired as a dishwasher at Flying J. He was required to take a pre-employment drug test. The test was positive for Darvocet and Norflex. Exhibit E. According to Ikenberry, he was taking these pain medications for a neck problem. He had two cervical spine surgeries in 1993 and 1994 and continues to have neck problems.

■ This finding of fact is also accurate, but once again serves no apparent purpose with respect to Ikenberry's burden of proof in this case nor to his credibility as a witness, particularly in light of the Hearing Examiner's ultimate conclusions. Ikenberry's physician testified that there was no relationship between the herniated disc at issue here and the problems associated with Ikenberry's neck, and there is no evidence to contradict

that. These facts do not serve as evidence proving a relevant preexisting condition. The references to Ikenberry's use of Darvocet and Norflex may have been intended to suggest an "intoxication" defense for the Division (the record bears out that the Division's investigator sought to elicit testimony that Ikenberry may have been intoxicated, though there was no evidence to suggest that was the case).

4. Shortly after going to work, Ikenberry purchased a pair of non-skid shoes to wear at work because of the slippery floors. Ikenberry testified he had worked at Flying J a week or week and one-half prior to March 15, 1998. He was sure of this because he recalled getting one paycheck prior to the March 15, 1998 incident. However, the records indicate that Ikenberry was hired and went to work at Flying J on March 13, 1998.

This finding is essentially accurate, at least to the extent that Ikenberry's testimony was that he was unsure exactly when he started working at Flying J. Both of the accident reports made by Ikenberry listed his date of hire as March 13, 1998. The main thrust of this "inconsistency" was caused by a question asked by his attorney ("I represent to you that your injury [date of hire] was a week, two weeks before the injury."). That miscalculation was likely based upon the accident report forms because at first glance it is easy to misconstrue the date of hire to be 3/3/98, not 3/13/98. In any event, the inconsistency, if any, was neither relevant nor material to the fact that Ikenberry was employed at Flying J on March 15, 1998, the date he claimed to have suffered his injury. Likewise, it is not rational to find an "inconsistency" from this recitation of facts—though we agree there is a "difference."

5. Ikenberry testified he had been working the 2:00 p.m. to 10:00 p.m. shift on March 15, 1998, and had been lifting and washing tubs of dishes. One of the requirements of his job was to wash the rubber floor mats near the end of his work shift. Ikenberry had taken up the five mats and was running them through the dishwasher. While pulling one of the mats from the dishwasher, he twisted his body,

slipped on the wet floor, and caught himself on a cart. According to Ikenberry, sometime near the end of his shift his back began to hurt.

6. Ikenberry testified that at the end of his shift he told Flossie Reeb (Reeb), the manager on duty, that he had hurt his back. According to Ikenberry he also told Kate Roberts (Roberts), a food server who was also staying at CAC, another waitress and Dave, the cook, that he had hurt his back. None of these people observed the incident because of the location of the dishwasher.

7. According to Ikenberry, Roberts gave him a ride back to CAC because he had missed the van. The next morning he had problems getting out of bed because of severe back pain. Once he was able to get up, he went to get a cup of coffee. At least two of the residents at CAC asked him what was wrong because he was walking hunched over and had problems standing up straight.

8. Roberts worked as a food server at Flying J and normally worked the 10:00 p.m. to 6:00 a.m. shift. Exhibit B, p. 2. Roberts was working on March 15, 1998 and is not sure if she drove Ikenberry home that night. She did not see him get hurt at work, but did see him the next morning all bent out of shape like a pretzel. Roberts asked Ikenberry what happened and he said he fell at work and hurt his back. Exhibit B, p. 5. Roberts recalled working one 2:00 p.m. to 10:00 p.m. shift in March but does not recall the day. Exhibit B, p. 7. She also recalls giving Ikenberry a ride home one night but thinks she was just having dinner that night. Exhibit B, p. 20.

The testimony of Roberts is important in many respects. She only worked one or two shifts at the Flying J with Ikenberry, although she too was a resident at CAC and knew him longer from that association. Her testimony was that she had known Ikenberry for about 45 days and that he had seemed fine (with respect to his back) before March 16, 1998. Another witness, Flossie Reeb, whose testimony we will address later, testified vehemently that the dishwashing area was not slippery (though that was premised on the mats being on the floor which, of course, they were not because Ikenberry had removed them from the floor to wash them). In contrast, Roberts stated that the area was very slippery. Indeed she went into that subject in great detail, while expressing concern that her truthfulness might jeopardize her job at Flying J. The evidence was uncontroverted that employees were required to wear non-skid shoes because the area was slippery. Roberts did relate that very shortly after the accident, Ikenberry told her he fell at work and hurt his back, and in that sense she could be a "witness" to Ikenberry's injury. *See* W.R.E. 803(1) and (3). Of course, her knowledge of the condition of the floors also qualified her as a witness. In both instances, we recognize that she was not an "eye-witness." Since Ikenberry's credibility is so central an issue in this case, we also note that Roberts spent several pages of her testimony attesting to Ikenberry's reputation for truthfulness, honesty, and being a "straight up kind of guy." In any event, Roberts's testimony corroborated Ikenberry's story in all respects. Again, there may be some minor "differences," but there are no inconsistencies.

9. Ikenberry went to the emergency room on March 16, 1998, and received treatment and pain medication for his back pain. He then went to Flying J and told them he would not be able to work because he had hurt his back at work the night before. On March 16, 1998, Ikenberry signed the first of two injury reports. Exhibit S–2. He filled out and signed the second report on March 17, 1998. Exhibit S–3. According to Ikenberry, the people at the Division told him to do two reports.

A brief comment on the final sentence demonstrates that the findings were not written with close attention to what is actually in the record. First, this finding suggests that Ikenberry's assertion that the Division told him to do two reports is unbelievable. However, Wyo. Stat. Ann. § 27–14–502(a) (LEXIS 1999) specifically calls for two reports to be made, one within 72 hours and the second within 10 days. Moreover, Ikenberry did not testify that "the people at the Division told

him to do two reports." He did testify that he went back to do a second report because he was warned by the Division that it was very important to get the report right. Moreover, Ikenberry's insistence on filing the correct reports within the time periods allowed is, indeed, a very important thing for an injured worker. Failure to report an injury in accordance with § 27–14–502(a) results in a presumption that the claim shall be denied. Wyo. Stat. Ann. § 27–14–502(c) (LEXIS 1999).

10. The report of injury signed on March 16, 1998, indicates that Ikenberry was hired on March 13, 1998, and injured his back at 9:00 p.m. on March 15, 1998 while working the 2:00 p.m. to 10:00 p.m. shift. It also indicates the injury was reported to Terry Dreher at 2:00 p.m. on March 16, 1998. This report does not have any witnesses listed. In the area requesting a description of the accident, the report states "Was doing dish that night said he had a back ache at end of night had also complained of back ache the night before." This report is signed by Reeb, the associate manager. Exhibit S–2. Ikenberry first testified that Reeb filled out the report and he signed it. Ikenberry later testified that Reeb had not filled it out but Terry Dreher had.

This is another finding that depends for its conclusions on an incomplete reading of the transcript, as well as ignoring the reports themselves. As we noted earlier, Ikenberry did initially express some difficulty in recalling who filled out the two reports. Finally, however, he did testify that it was not his handwriting on the first report, and that he recalled that Reeb had filled out that report. On its face, the report indicates that Reeb filled it out, and the handwriting, as well as the use of language, indicates that Reeb was answering the questions (instead of saying, " I was doing . . . ," it says, "He was doing . . ."). Ikenberry testified that he filled in the second report after being warned he needed to make sure it was an accurate report. Under these very clear circumstances it is difficult to conclude that Ikenberry was being "inconsistent." The more believable conclusion is that, after consulting with the Division about his claim, Ikenberry

concluded that he needed to be more thorough.

11. The second report of injury was completed by Ikenberry on March 17, 1998. This report indicates he was hired on March 13, 1998, and injured his back at 8:00 p.m. on March 15, 1998 while working the 6:00 a.m. to 2:00 p.m. shift. It indicates the injury was reported to "Flossy (manager)" at 9:00 p.m. on March 15, 1998. This report lists Reeb and Roberts as witnesses. In the area requesting a description of the accident it states "working in dishtank lifting heavy mats and lifting heavy tubs of dishes on slippery floor." Exhibit S–3.

Here again, the record does not support the findings. There is a minor difference in the time the injury occurred, but Ikenberry's reports and his testimony were always consistent that it occurred near the end of his shift (between 8:00 p.m. and 10:30 p.m.). Apparently, the Hearing Examiner found an inconsistency between Reeb's characterization of the place of the injury in the first report as "doing dish[es]" and Ikenberry's characterization of it as "working in dishtank." It is also noted that the second report listed two witnesses. A likely explanation is that Reeb did not list any witnesses because Ikenberry admitted from the beginning that there were no "eye-witnesses," so Reeb did not list any in the report that she wrote. As noted above, it is certainly credible that persons to whom Ikenberry promptly reported the accident could be viewed as "witnesses," by lawyer or layman alike (indeed, the Division relied on both as witnesses and makes use of their testimony to attempt to support the "inconsistencies"). Ikenberry's testimony concerning the second report was that he was warned to be thorough and, thus, included in the report the names of two potential witnesses. Reeb conceded that Ikenberry told her the night of the accident that his back hurt (here we encounter another "inconsistency" in the sense that Ikenberry claimed he told Reeb he hurt his back, while she said he reported that his "back ached," hardly the stuff of a rationale for inconsistency). Reeb did not consider that a report of an injury because Ikenberry com-

plained "every night" about a back ache, although he only worked there three days, and she could not remember if she had worked all three with him. More importantly, Ikenberry's physician testified that the onset of the pain and disability which follows an injury, such as that Ikenberry sustained, may not show up for hours or even days. Reeb testified that it was not slippery in the dishwashing area because there were mats on the floor (this, despite the uncontradicted evidence that all employees were required to wear non-skid shoes). The testimony from Ikenberry and Roberts was that it was extremely slippery in that area and, moreover, at the time Ikenberry suffered his injuries, the mats were not on the floor but in the dishwasher. The credibility gap here goes to Reeb, not to Ikenberry.

12. Ikenberry was asked to explain the various discrepancies. He testified he was not sure of the time of the incident when he slipped, other than it was near the end of his shift. He said it might have been 8:00 p.m., 8:30 p.m. or sometime prior to 10:30 p.m. Ikenberry said he did report the injury to Reeb at the end of his shift on the 15th, but told her he was not sure how bad he was hurt. Ikenberry said he did report the injury to Terry Dreher on the 16th and it was about 2:00 p.m. when they filled out the report. Ikenberry also indicated he did put down the 6:00 a.m. to 2:00 p.m. shift because that was his new work shift.

It is at most inconsequential that Ikenberry did not report the severity of his injury on the night of March 15, 1998, because the severity was unknown to him until the next day. Apparently, the Hearing Examiner faults Ikenberry for indicating that his "normal work hours" were from 6:00 a.m. until 2:00 p.m. when there is no question but that Ikenberry worked from 2:00 p.m. until 10:30 p.m. on March 15, 1998. An employee's "normal work hours" may well be different from hours actually worked and, indeed, Ikenberry's testimony that his hours were variable was not rebutted.

13. Reeb was interviewed and the transcript of that interview was admitted into evidence. Exhibit S–1. She stated that Ikenberry told her of a back problem prior to going to work for Flying J and that he complained of a backache every night after his work shift. Exhibit S–1, p. 5. Ikenberry's drug screen indicated muscle relaxers and pain medications which he said were for his back pain. According to Reeb, Ikenberry never mentioned anything about a work injury and that if he had, she would have completed an incident report. Exhibit S–1, p. 9. Reeb thinks Ikenberry told her he had worked in the oilfield and had some kind of injury with that job. Exhibit S–1, p. 11. Ikenberry denied telling Reeb his back ached after each work shift.

Reliance on Reeb's testimony that Ikenberry complained of a back ache "every night she worked with him" seems almost ludicrous in light of the fact that she worked with him for at most three nights and maybe only two. Her description of a prior back problem is unsubstantiated by any medical evidence. Indeed, the medical evidence contradicted it. Dr. Metz testified that Ikenberry's previous problems were with his neck and had absolutely nothing to do with the back injury which was corrected with surgery.

14. Ikenberry received treatment for his back condition and was seen by a chiropractor several times. The chiropractor decided there was something wrong, ordered an MRI and sent Ikenberry to Dr. Albert V. Metz, Jr.

15. The MRI of March 20, 1998 revealed degenerative disc disease and bulging or herniated discs. Disc dehydration and a broad based central herniation were found at L3–4. Disc dehydration and a focal central herniation were found at L4–5. Disc dehydration and a small central herniation were found at L5–S1. Exhibit D.

16. Ikenberry first saw Dr. Metz, a neurological surgeon, on March 24, 1998. At that time, Ikenberry was standing with his hips and knees flexed and was leaning forward. He could not straighten up without pain and could bend forward about 45 degrees. The leg lift indicated a nerve in the low back was possibly trapped. Exhibit A, p. 7. Ikenberry gave a history of lifting 80 pound floor mats, washing them, and while lifting and twisting, his feet

slipped a couple of times. Ikenberry developed pain a couple hours later. Exhibit A, p. 9. According to Dr. Metz, it is common to experience pain hours or days after an injury. Exhibit A, p. 10.

17. Based upon the history, the examination, and the MRI, Dr. Metz ordered surgery which was performed on March 25, 1998. Exhibits F and G. Dr. Metz stated he was unable to provide a date for the injury which caused the herniated disc. Exhibit A, p. 15. However, he did state that his observations of the tissue during the surgery provided some evidence of a fairly recent phenomenon. Exhibit A, p. 16.

18. It is Dr. Metz' opinion that the herniated disc at L4–5 was consistent with the mechanism of injury reported by Ikenberry and that lifting heavy objects and turning is a common mechanism for an acute ruptured disc. Dr. Metz also indicated that Ikenberry had degenerative changes at other disc levels and that was not unusual for a person like Ikenberry who has done fairly heavy work. Exhibit A, p. 18. Dr. Metz also stated "I think there was either a material aggravation or an acute precipitation of the disk herniation in his back at the time that he lifted and twisted with those heavy mats." Exhibit A, p. 19.

19. Dr. Metz has treated several thousand herniated discs in his practice. He stated that he is unable to tell how recent a herniation has occurred and that he relied on the patient history in forming an opinion. Exhibit A, p. 22. According to Dr. Metz all his opinions are based upon the history provided by Ikenberry and that he did not go into Ikenberry's past history of back pain as much as he should have. Exhibit A, p. 23 and 24.

20. The medical evidence is clear that Ikenberry had a herniated disc and that it has been surgically repaired. However, how the disc was herniated and when the disc was herniated is not clearly established by the evidence. While Ikenberry has given a history of a lifting and twisting incident at work, there were no witnesses to the incident. Additionally, there are numerous inconsistencies in the evidence presented by Ikenberry including how long he worked before the injury, when he reported the injury, his work shift, the time of the injury, who he reported the injury to, and listing witnesses when there were none. The numerous inconsistencies lead this Office to find that Ikenberry's testimony is questionable at best. Since his testimony is questionable, the opinion of Dr. Metz as to the work-relatedness of the injury is not given much weight. The Office concludes that benefits should be denied.

As is set out more completely in our statement of the facts and the interlineations within the findings made by the Hearing Examiner, this conclusion simply cannot be sustained by the record presented to this Court for review. Based on these faulty findings, the Hearing Examiner reached the following conclusions.

### CONCLUSIONS OF LAW

1. A claimant in a workers' compensation case has the burden of proving all the statutory elements which comprise a "compensable injury." *Matter of Worker's Compensation Claim of Thornberg*, 913 P.2d 863 (Wyo.1996) and *Workers' Compensation Claim of Jacobs*, 924 P.2d 982 (Wyo.1996). This burden includes establishing the cause of the condition for which compensation is claimed and that the injury arose out of and in the course of the employment. See Wyo. Stat. Ann. § 27–14–102(a)(xi) (Michie 1997) *State ex rel. Workers' Compensation v. Espinoza*, 924 P.2d 979, 981 (Wyo.1996) citing *Baker v. Wendy's of Montana, Inc.*, 687 P.2d 885, 892 (Wyo.1984). In this case, Ikenberry must establish that his work effort at Flying J resulted in the herniated disc or materially aggravated a pre-existing degenerative condition.

2. A claimant has the burden of establishing each and every statutory element by a preponderance of the evidence. *Thornberg*, 913 P.2d at 866 and *Jacobs*, 924 P.2d at 984.

A "preponderance of the evidence," is defined as "proof which leads the trier of fact to find that the existence of the

contested fact is more probable than its non-existence." *Scherling v. Kilgore,* 599 P.2d 1352, 1359 (Wyo.1979).

*Thornberg,* 913 P.2d at 866. The evidence presented is not to be liberally construed in a claimant's favor when determining if an injured worker has met that burden of proof. *Matter of Fansler,* 914 P.2d 156 (Wyo.1996).

3. Where the condition for which compensation is sought involves complex medical issues, the technical knowledge and testimony of medical experts may be both highly persuasive and relevant to the resolution of questions concerning causation. *Black Watch Farms v. Baldwin,* 474 P.2d 297, 300 (Wyo.1970), citing *Bocek v. City of Sheridan,* 432 P.2d 893, 894–895 (Wyo. 1967). This is not to say though that medical testimony which amounts to speculation or which is based upon a questionable history necessarily carries such weight. *Matter of Krause,* 803 P.2d 81 (Wyo.1990).

4. Whether an employee's injury occurred in the course of his employment is a question of fact. *Cabral v. Casper Building Systems, Inc.,* 920 P.2d 268 (Wyo. 1996). Weighing the evidence and assessing the credibility of witnesses is the responsibility of the hearing examiner. *Cabral,* 920 P.2d at 271 and *Fansler,* 914 P.2d at 159.

5. In the case of *Latimer v. Rissler & McMurry Co.,* 902 P.2d 706, 711 (Wyo. 1995), the Wyoming Supreme Court stated:

> When the inconsistencies in the evidence and the claimant's testimony make it impossible for the hearing examiner to determine whether the accident arose out of in the course of his employment, the claimant has failed to sustain his burden. *Farman v. State ex rel. Wyoming Workers' Compensation Division,* 841 P.2d 99, 103 (Wyo.1992).

6. Ikenberry has failed to meet his burden. While there is no question that Ikenberry had a herniated disc which was surgically repaired, the evidence does not establish his work at Flying J was the cause of the herniated disc. Ikenberry has degenerative disc disease which is a pre-existing condition and there are a number of ways an individual can herniate a disc. Simple tasks like bending over and coughing can cause a herniated disc. Ikenberry describes a lifting and twisting incident at work which was not observed by anyone and this could have caused the herniation. However, due to the numerous inconsistencies in Ikenberry's evidence, this Office has concluded that his testimony is questionable at best. Since Ikenberry's rendition of the event is questionable, any medical opinion based upon it is also questionable. Since the evidence is questionable, Ikenberry has failed to prove his herniated disc arose out of and in the course of his employment.

■ Based upon our recitation of the record as set out above, we hold that the Hearing Examiner's decision was not based on relevant factors and was not rational. For this reason, the decision to deny Ikenberry benefits is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

On other occasions we have been called upon to evaluate determinations of a hearing examiner with respect to credibility of witnesses, especially in the context of inconsistencies or contradictions in testimony. A comparison of two of those cases with this case will make more evident the error we find in the instant case. In *Morgan v. Olsten Temporary Services,* 975 P.2d 12, 15–16 (Wyo.1999), we affirmed a denial of worker's compensation benefits based on these facts: The worker's supervisor first learned of the slip and fall accident at the hearing; the evidence was to the effect that the worker did not engage in any heavy lifting or other tasks which might have caused an injury; the worker told his physician that there was no specific episode that caused the injury, whereas at the hearing, the worker testified that he slipped and fell while carrying boxes down a flight of stairs, and the worker also contradicted his earlier statements to his physician that the onset of pain was progressive over a period of time; whereas at the hearing, he testified that the onset of pain was immediate. In *Latimer v. Rissler & McMurry Co.,* 902 P.2d 706, 709–11 (Wyo.

1995), we based our affirmation of a denial of benefits on a litany of contradictions in the testimony of the injured worker as to the source and date of the injurious incident, as well as contradictions in the testimony of five treating physicians. Those cases present examples wherein the hearing examiner considered relevant factors, and the conclusions gleaned from those factors were rational.

■ The Division asks that, based on this record, we determine that Ikenberry failed to prove by a preponderance of the evidence that he suffered a material aggravation of a preexisting condition. In the alternative, the Division asks that we remand that same issue to the Hearing Examiner to make findings and conclusions.

What the Division requests is a new hearing at which it can have the opportunity to develop and present the case it did not present the first time around. We decline to grant such a remand. The evidence of record fully supports a conclusion that Ikenberry suffered an injury while employed at the Flying J Restaurant and is, therefore, entitled to benefits. Consequently, we reverse the Order Denying Benefits, and the case is remanded to the Office of Administrative Hearings for the sole purpose of determining the appropriate amount of worker's compensation benefits that should be awarded to Ikenberry.

Reversed and remanded to the Office of Administrative Hearings.