# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 82

APRIL TERM, A.D. 2014

*June 25, 2014*

ROGER SEHERR-THOSS, d/b/a RST
SAND & GRAVEL and/or RST
EXCAVATION AND TRUCKING,

Appellant
(Petitioner),

v.

TETON COUNTY BOARD OF
COUNTY COMMISSIONERS and
TETON COUNTY PLANNING
DIRECTOR,

Appellees
(Respondents).

S-13-0086

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

***Representing Appellant:***
Elizabeth N. Moore Ibanez and Joseph F. Moore Jr., of Moore & Myers, LLC, Jackson, WY. Argument by Ms. Moore Ibanez.

***Representing Appellees:***
Keith M. Gingery, Deputy County Attorney, Jackson, WY; and Lori Potter of Kaplan Kirsch Rockwell, Denver, CO. Argument by Mr. Gingery.

***Before HILL, BURKE, and DAVIS, JJ., and GOLDEN, J. (Ret.), and KAUTZ, D.J.***

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**KAUTZ,** District Judge.

[¶1]   On June 7, 2010, Appellee, the Teton County Board of County Commissioners and Teton County Planning Director ("Teton County" or "County" or "Planning Director"),[1] issued a Notice to Abate to Appellant Roger Seherr-Thoss ("RST"). The County found that RST's gravel business violated the County's Land and Development Regulations ("LDRs") because the business had expanded in volume and footprint since the LDRs were adopted in 1978. The Planning Director issued an amended Notice to Abate on February 16, 2011 that required RST to reduce levels of production to pre-1978 levels. Following RST's appeal to the Teton County Board of County Commissioners ("Board"), a contested case hearing was held on June 14-16, 2011. On August 8, 2011, the hearing officer issued a Recommended Findings of Fact, Conclusions of Law, and Order. After holding hearings on September 7 and November 1 of 2011, the Board adopted the hearing officer's Recommended Findings of Fact, Conclusions of Law, and Order with minimal amendments, issuing its decision on November 7, 2011. The Order recognized that RST's historical gravel crushing and extraction operations were grandfathered under Wyo. Stat. Ann. § 18-5-207. However, the Order attempted to reduce RST's operation to its 1978 extent. It required RST to reduce his operation's footprint to three acres, to submit a reclamation plan to the County within sixty days, to post a surety bond consistent with the LDRs within sixty days, to reduce his volume of extracted gravel to 15,000 cubic yards or 17,000 tons per year, and to limit his operating hours to Monday through Friday from 7:00 a.m. to 5:00 p.m.

[¶2]   RST next appealed the Board's Order to the Teton County District Court. The district court affirmed the Board's decision. We reverse.

## ISSUES

[¶3]   RST presents the following issues on appeal:

> I.     Did the Teton County Board of County Commissioners (Board) err in concluding that Wyo. Stat. § 18-5-207 does not prevent the County from prohibiting or otherwise regulating or limiting the expansion or enlargement of the use of Roger Seherr-Thoss's land for continued extraction and processing of gravel when Mr. Seherr-Thoss's family was using their land for that purpose before the County prohibited it through enactment of the Teton County Land Development Regulations (LDRs)?

---

[1] This opinion refers to the Teton County Board of County Commissioners as the Board when it is acting as the reviewing agency.

1

II.    Did the Board err in concluding that its authority to regulate Roger Seherr-Thoss's grandfathered gravel operation is not preempted by the Department of Environmental Quality's (DEQ) pervasive regulatory system, which regulates most aspects of the operation including bonding, reclamation, and expansion?

III.    Did the Board misapply the doctrine of diminishing assets and fail to base its finding that Seherr-Thoss was not permitted any natural and necessary expansion of his family gravel mining operation on substantial evidence?

IV.    Did the District Court or the Board abuse its discretion in failing to apply the equitable doctrine of estoppel to bar the County from requiring the [sic] Roger Seherr-Thoss to prove the scope and scale of his gravel extraction operations when Seherr-Thoss presented unrefuted evidence that the County purchased gravel from him and then waited nearly twenty years before attempting to shut down his livelihood under the Land Development Regulations?

The County phrases the issues on appeal as:

I.    Whether Wyo. Rev. Stat. § 18-5-207 Authorizes the County to Reasonably Regulate Expansion of RST's Gravel Operation.

II.    Whether the Wyoming Environmental Quality Act Preserves a Role for Counties to Regulate Expanded, Nonconforming Gravel Operations.

III.    Whether Substantial Evidence Supports the Determination that the Doctrine of Diminishing Assets Does Not Authorize Expansion of RST's Gravel Operation.

IV.    Whether Substantial Evidence Supports the Determination that Equitable Estoppel and Laches Do Not Bar the County from Enforcing its Zoning Regulations.

**FACTS**

[¶4]     RST and his father owned and operated an approximately 350-acre cattle ranch in Teton County, Wyoming.  In the 1970s, RST also operated a trucking business to supplement his income.  Since at least 1977, RST and his father stopped other economic pursuits, cut back on their livestock operation, and focused on operating a gravel operation.  They have continuously operated a gravel operation within the 350-acre ranch.

[¶5]     In 1978, Teton County enacted its first LDRs.  Those LDRs placed RST's property in a residential-agricultural zone.  In this type of zone, the County does not permit gravel operations unless the landowner obtains a special-use permit ("SUP") from the County.  In 1994, the County repealed and replaced the 1978 LDRs with the 1994 LDRs, which also prohibited gravel operations on RST's property.

[¶6]     The County did not begin to investigate and attempt to enforce its LDRs against RST until 1995, claiming that it did not have knowledge of RST's gravel operation.  When the County began investigating RST's gravel operation, it was a small operation using approximately three acres.  Nonetheless, RST derived most of his income from his gravel operation.  The operation was located in a portion of the ranch where it could be expanded in accordance with need and economic benefit to RST.  From 1995 to 2010, the County and RST engaged in discussions regarding the legality of RST's use of his property.  After discussions and short-term solutions had failed to resolve the issue, the Planning Director issued a Notice to Abate to RST on June 7, 2010 that ordered him to cease gravel crushing and extraction operations on his property and to reduce his screening and stockpiling to pre-1978 levels.  On February 16, 2011, the Planning Director subsequently amended the Notice to Abate to also require RST to reduce his production levels to pre-1978 levels.  RST appealed to the Board.

[¶7]     After a contested case hearing held on June 14-16, 2011, a hearing officer issued a Recommended Findings of Fact, Conclusions of Law, and Order.  The hearing officer found that that all aspects of RST's gravel operation, including gravel extraction and crushing, were grandfathered under Wyo. Stat. Ann. § 18-5-207.  The hearing officer also found, however, that the size and scope of RST's land use was grandfathered only to the extent of his operations at the time the LDRs became effective in 1978.  To that end, the hearing officer examined the earliest available evidence that indicated the size and scale of RST's operation.  The hearing officer found that the first inspection of RST's gravel operation occurred in 1995 and was conducted by John Erickson of the Wyoming Department of Environmental Quality ("DEQ").  This inspection revealed that RST's operation covered approximately three acres. RST first reported production volume of 16,200 tons to the Department of Revenue in 1996.  In 1998, RST first reported extraction volume to DEQ of 15,000 cubic yards or 17,000 tons of gravel per year.

3

[¶8]   On November 7, 2011, the Board issued its decision, which adopted the hearing officer's Recommended Findings of Fact, Conclusions of Law, and Order with minimal amendments.  Although the Order recognized that all aspects of RST's gravel operation were grandfathered, it required RST to reduce the footprint of his operation to three acres, to submit a reclamation plan to the County within sixty days, to post a surety bond consistent with the LDRs within sixty days, to reduce his volume of extracted gravel to 15,000 cubic yards or 17,000 tons per year, and to limit his operating hours to Monday through Friday from 7:00 a.m. to 5:00 p.m.

[¶9]   RST appealed to the Teton County District Court.  The district court affirmed the Board's Order.  RST then filed this timely appeal.  On December 10, 2013, this Court heard oral argument.  Further facts are included below with the analysis for each issue.

## STANDARD OF REVIEW

[¶10]  The Wyoming Rules of Appellate Procedure govern reviews of administrative decisions.  W.R.A.P. 12.  Specifically, Rule 12.09(a) limits review to matters contained in the Wyoming Administrative Procedure Act, which provides in pertinent part:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.  The reviewing court shall:
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; [or]
> . . . .
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2013).

4

[¶11] When reviewing an "appeal from a district court's review of an administrative agency's decision, we give no special deference to the district court's decision. Instead, we review the case as if it had come directly to us from the administrative agency." *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008) (internal quotation marks omitted).

[¶12] We apply the substantial evidence standard whenever we review an evidentiary ruling. *Dale,* ¶ 22, 188 P.3d at 561. When conducting a substantial evidence review of the record, we extend to the administrative agency the deference that we normally accord to the findings of fact by a trial court. *Id.,* ¶ 11, 188 P.3d at 558. We are mindful that "the administrative body is the trier of fact and has the duty to weigh the evidence and determine the credibility of witnesses." *Id.* In *Dale,* we further explained the application of the substantial evidence standard.

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale,* ¶ 22, 188 P.3d at 561 (citations omitted).

[¶13] In *Dale,* we also explained the appropriate application of the arbitrary and capricious standard. We described it as a

> "'safety net' to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Newman,* ¶ 23, 49 P.3d at 172. Although we explained the "safety net" application of the arbitrary and capricious standard in *Newman,* we will refine it slightly here to more carefully delineate that it is not meant to apply to true evidentiary questions. Instead, the arbitrary and capricious standard will

5

apply if the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law. This listing is demonstrative and not intended as an inclusive catalog of all possible circumstances. *Id.*

*Dale*, ¶ 23, 188 P.3d at 561.

[¶14] "As always, we review an agency's conclusions of law *de novo,* and we will affirm an agency's legal conclusion only if it is in accordance with the law." *Dale*, ¶ 26, 188 P.3d at 561-62 (internal quotation marks omitted).[2]

[¶15] Last, we highlight some pertinent rules pertaining to the standard of proof. "The normal standard of proof in administrative hearings is the preponderance-of-the-evidence

---

[2] Citing *Wilson Advisory Committee v. Board of County Comm'rs*, 2012 WY 163, ¶ 22, 292 P.3d 855, 862 (Wyo. 2012), the County asserted, "An agency's interpretation of its own statute and regulations deserves deference." *Wilson* does not support this proposition. We stated in *Wilson*:

> In all cases, we review an agency's conclusions of law *de novo.* An agency's own rules and regulations "have the force and effect of law, and an administrative agency must follow its own rules and regulations or face reversal of its action." However, "we defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules."

*Wilson*, ¶ 22, 292 P.3d at 862 (citations omitted). A plain reading of this paragraph not only reveals no mention of the word "statute," but also reveals that we were clearly referring to the rules and regulations that an agency promulgates. Other cases, however, somewhat support the County's assertion. *Petroleum Inc. v. State ex rel. State Bd. of Equalization*, 983 P.2d 1237, 1240 (Wyo. 1999) ("We generally defer to the construction placed on a statute by the agency that is charged with its execution, provided, however, that the agency's construction does not conflict with the legislature's intent."); *see also Laramie Cnty. Bd. of Equalization v. Wyo. State Bd. of Equalization*, 915 P.2d 1184, 1190 (Wyo. 1996). Our earlier pronouncements of this principle delineated its boundaries and rationale more carefully.

> Administrative interpretation of a statute . . . [is] entitled to weight when the legislature has failed over a long period of time to make any change in the statute. Such failure is some indication of an acquiesence [sic] by the legislature to administrative interpretation . . . . During the past sixty years, the legislature has had ample opportunity to amend the statute to include the words "sewage disposal," but it has not. Such long-standing acquiescence is an indication of legislative intent.

*Public Serv. Comm'n v. Formal Complaint of WWZ Co.*, 641 P.2d 183 at 186 (Wyo. 1982) (citation omitted); *see also State Bd. of Equalization v. Tenneco Oil Co.*, 694 P.2d 97 (Wyo. 1985); *School Districts Nos. 2, 3, 6, 9, and 10, in Campbell Cnty. v. Cook*, 424 P.2d 751, 756 (Wyo. 1967).

In the present matter, the County's interpretation of the applicable statutes is not longstanding, providing the legislature with no opportunity to acquiesce to it. Thus, we have no basis for giving weight or deference to the County's interpretation and will not do so.

standard." *JM v. Dept. of Family Servs.*, 922 P.2d 219, 223 (Wyo. 1996). If the hearing officer deems credible the admitted evidence submitted by the burdened party and "there is no meaningful evidence in conflict with it," then that party has met his burden of proof by a preponderance of the evidence. *Ikenberry v. State ex rel. Wyo. Workers' Comp. Div.*, 5 P.3d 799, 803 (Wyo. 2000). An individual's testimony alone is sufficient to carry the individual's burden if there is nothing to impeach or discredit the individual's testimony and the individual's statements are corroborated by surrounding circumstances. *Id.* Accordingly, a lack of documentary evidence does not prevent the hearing officer from making findings of fact, s*ee Id.*, since "[t]he issue of documentary [evidence] versus oral testimony is one of weight." *Houx v. Houx*, 2006 WY 102, ¶ 25, 140 P.3d 648, 655 (Wyo. 2006).

## DISCUSSION

### I. The Extent of a County's Statutory Zoning Authority

[¶16] RST first contends that Wyo. Stat. Ann. § 18-5-207 unambiguously denies the County the authority to regulate expansion of a grandfathered nonconforming land use, such as his gravel operation. Additionally, he asserts that, even if this Court finds § 18-5-207 ambiguous, the application of statutory construction rules will not change the limitation that § 18-5-207 places on the County's zoning authority. The County argues that expansion of a grandfathered nonconforming use is subject to its statutory zoning authority under Wyo. Stat. Ann. § 18-5-201. Furthermore, the County asserts that when the statute is construed and read *in pari materia*, the limitations in § 18-5-207 do not prevent the County from regulating expansion of RST's gravel operation.

[¶17] RST's first argument presents a legal issue that we review *de novo*. Because this issue implicates many statutory construction rules, we recite them in detail.

> Statutory interpretation involves a reasoned search for the intention of the legislature. We interpret statutory language in light of the purpose and policy behind the enactment. In seeking to ascertain the intent of the legislature regarding the proper construction, we are guided by the fact that the legislature is presumed to have intended a reasonable, just, and constitutional result.

*Kunkle v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 49, ¶ 11, 109 P.3d 887, 889-90 (Wyo. 2005) (citation omitted). Since we presume that the legislature enacted the statutes "with full knowledge of existing law, . . . we construe statutes in harmony with existing law, particularly other statutes relating to the same subject or having the same purpose." *Rodriguez v. Casey*, 2002 WY 111, ¶ 9, 50 P.3d 323, 326 (Wyo. 2002).

7

[¶18] Our first step is to determine whether the applicable statutes are ambiguous.

> A statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. A statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations.
>
> . . . .
>
> When the words used are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. . . . If the language selected by the legislature is sufficiently definitive, that language establishes the rule of law. . . . This inhibition upon statutory construction offers assurance that the legislative efforts and determinations of elected representatives will be made effective without judicial adjustment or gloss.

*Kunkle*, ¶ 11, 109 P.3d at 890 (citations omitted) (internal quotation marks omitted).

[¶19] Regarding the mechanics of statutory interpretation, "we give effect to every word, clause and sentence, and construe them in pari materia." *Kunkle*, ¶ 11, 109 P.3d at 890. Moreover, we strive to avoid an interpretation that produces an absurd result, *Rodriguez*, ¶ 9, 50 P.3d at 326, or that renders a portion of the statute meaningless. *Kunkle*, ¶ 11, 109 P.3d at 890.

> We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole. Each word of a statute is to be afforded meaning, with none rendered superfluous. Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly intended. If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose. We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another. If two sections of legislation appear to conflict, they should be given a reading that gives them both effect.

8

*Rodriguez*, ¶ 10, 50 P.3d at 326-27 (citations omitted).

[¶20] Finally, we are mindful of the

> . . . well-known principle of law that courts are not free to legislate. The first rule of statutory construction is that legislative intent, not a court's perception of fairness, controls. It is not the court's prerogative to usurp the power of the legislature by deciding what should have been said. The courts must follow, and cannot extend, statutory definitions. For over a century, courts in Wyoming have recognized that it is their duty only to interpret and declare what the law is, not to be responsible for its defects. And of specific importance to the instant case is the precept that exceptions not made by the legislature in a statute cannot be read into it."

*Scott v. Scott*, 918 P.2d 198, 200 (Wyo. 1996) (citation omitted).

[¶21] The statutes at issue read as follows:

> **§ 18-5-201. Authority vested in board of county commissioner; inapplicability of chapter to incorporated cities and towns and mineral resources.**
> To promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county. However, nothing in W.S. 18-5-201 through 18-5-208 shall be construed to contravene any zoning authority of any incorporated city or town and no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto.

> **§ 18-5-207. Continuation of existing uses; effect of alteration or addition; future use after discontinuation of nonconforming use.**
> A zoning resolution enacted under the provisions of W.S. 18-5-201 through 18-5-206 shall not prohibit the continuance of the use of any land, building or structure for

the purpose for which the land, building or structure is used at the time the resolution is adopted and it is not necessary to secure any certificate permitting such continuance. However the alteration or addition to any existing building or structure for the purpose of effecting any change in use may be regulated or prohibited by zoning resolution. If a nonconforming use is discontinued any future use of such land, building or structure shall be in conformity with the provisions of the resolution regulating uses in the area in which the land, building or structure is located.

Wyo. Stat. Ann. §§ 18-5-201; 18-5-207 (LexisNexis 2013).

[¶22] Both sides recognize that § 18-5-201 permits the County to exercise general zoning authority. They also agree that the first sentence of § 18-5-207 permits the continuance of pre-existing land uses despite subsequent changes in zoning regulations. From this point, the parties' interpretations diverge. RST contends that, while the second sentence of § 18-5-207 creates a permissive exception that permits counties to regulate or prohibit the alteration of or addition to **buildings or structures** for the purpose of effecting any change in use, it does not permit counties to do the same for land uses because this sentence omits the word(s) "land" or "land use." Arguing that the legislature intentionally omitted "land" or "land use," RST notes that

> [t]he Legislature chose to use the phrase "land, building or structure" four times in a single three-sentence paragraph circumscribing the power of a county to interfere with existing uses. Yet, in the sentence giving back limited powers with regard to expansion of those uses, the Legislature changed that phrase by omitting the word "land."

[¶23] In contrast, the County stresses that legal nonconforming uses, although recognized in Wyoming as a vested right, are to be construed narrowly because they thwart the public policy behind comprehensive planning. When viewed in this context and read *in pari materia*, the County contends that the omission of "land" in the second sentence of § 18-5-207 creates ambiguity as to why it was omitted. The County next argues that when the statutory construction rules are applied, this Court cannot interpret § 18-5-207 as RST advocates. The County argues that adopting RST's interpretation would violate the rule that courts must avoid construing the statute in a manner that renders a part of it meaningless or that produces absurd results. First, the County contends that RST's interpretation would render its broad zoning authority under § 18-5-201 meaningless by allowing nonconforming uses to expand unregulated and without limit. Second, the County asserts that RST's interpretation would lead to an absurd result because unrestrained nonconforming uses could become nuisances.

10

[¶24] We begin by noting that Title 18, Chapter 5 of the Wyoming Code contains the statutes that grant counties planning and zoning authority and prescribe the limits of that authority. In the present case, we only need to focus on article two and specifically §§ 18-5-201 and 18-5-207. It is also important to note that counties "have no sovereignty independent from that of the state, and the only power available to them is the power that has been delegated to them by the state." *Ahearn v. Town of Wheatland*, 2002 WY 12, ¶ 14, 39 P.3d 409, 415 (Wyo. 2002). Thus, a county's authority "to adopt a zoning ordinance is limited by state statute, and the general grant of power to [counties] to adopt zoning laws in the interest of public welfare does not permit the local governing bodies to override the state law and the policies supporting it." *Id.*

[¶25] As the parties recognize, § 18-5-201 permits counties to regulate and restrict land uses in the unincorporated areas of the county. This zoning authority has limits. One limit is that this authority must be exercised in a manner that "promote[s] the public health, safety, morals and general welfare of the county." *Id.* Furthermore, when a county issues a resolution pursuant to those ends, it must use reasonable means to implement the regulation. *Snake River Brewing Co. v. Town of Jackson*, 2002 WY 11, ¶ 26, 39 P.3d 397, 407 (Wyo. 2002).

[¶26] Section 18-5-207 contains the other significant limitation, which, as we explain, contains some ambiguity. The first sentence reads:

> A zoning resolution enacted under the provisions of W.S. 18-5-201 through 18-5-206 shall not prohibit the continuance of the use of any land, building or structure for the purpose for which the land, building or structure is used at the time the resolution is adopted and it is not necessary to secure any certificate permitting such continuance.

*Id.* While § 18-5-201 grants counties general zoning authority, § 18-5-207 circumscribes that authority by permitting the continuance of uses that predate the adoption of a legal zoning resolution. We have also explained this limitation as a nonconforming use exception or a grandfather exception.

> A non-conforming use is a use which, although it does not conform with existing zoning regulations, existed **lawfully** prior to the enactment of the zoning regulations. These uses are permitted to continue, although technically in violation of the current zoning regulations, until they are **abandoned**. An exception of this kind is commonly referred to as a "grandfather" exception.

11

*River Springs, Ltd. Liability Co. v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 899 P.2d 1329, 1334 (Wyo. 1995) (internal quotation marks omitted) (emphasis in original). This sentence of § 18-5-207 recognizes that the "right to continue a non-conforming use is a vested property right [that is] protected . . . by both federal and state constitutions." *Snake River Brewing Co.*, ¶ 10, 39 P.3d at 403.[3]

[¶27] The second sentence of § 18-5-207 gives counties zoning authority over certain nonconforming uses by creating a permissive exception to the grandfather exception contained in the first sentence. The second sentence reads, "However the alteration or addition to any existing building or structure for the purpose of effecting any change in use may be regulated or prohibited by zoning resolution." *Id.* Section 18-5-207 unambiguously gives counties authority to regulate or prohibit alterations or additions to grandfathered buildings or structures when the alteration or addition effectuates a change in use of the grandfathered building or structure. It says nothing about changes in use of grandfathered lands.

[¶28] RST argues that the legislature specifically included "land" with "building or structure" four other times in § 18-5-207, but omitted the term "land" when it said that alterations or additions to existing buildings or structures could be regulated. This omission, RST claims, indicates that a county may not regulate his continued nonconforming use of his lands. RST misunderstands § 18-5-207. This statute simply states that a change to an existing building or structure for the purpose of changing the nonconforming use of the building or structure is subject to regulation. It makes no statement about change in use of land.

[¶29] The absence of a reference to "land" in the statutory provision about changes to buildings or structures does not imply that a change in use of grandfathered land is exempt from zoning regulations. The second sentence of § 18-5-207 simply means that zoning regulations apply to alterations of or additions to grandfathered buildings or structures when those modifications are made **for the purpose of changing use**. In essence, when an owner of a grandfathered building wishes to modify the building **for the purpose of changing use**, he must comply with zoning requirements (*i.e.*, building permits or variances). This sentence has no applicability to a change in use of land. Thus, we hold that the second sentence of § 18-5-207 creates a permissive exception to the grandfather exception in the first sentence and that this permissive exception is limited to certain uses of buildings and structures and not uses of land.

[¶30] This determination does not resolve the issue presented in this case. Although the parties' ambiguity arguments primarily concern the second sentence of § 18-5-207, the first sentence contains the real ambiguity—the geographic extent of the word "land."

---

[3] We also noted that "[s]uch protection is generally stated in terms of due process of law." *Snake River Brewing Co. v. Town of Jackson*, ¶ 10 n.2, 2002 WY 11, 39 P.3d 397 at 407 (Wyo. 2002).

Resolving this ambiguity is necessary to determine whether a county may regulate the expansion of a nonconforming land use under § 18-5-207. The statute is silent as to whether one may continue a pre-existing use of land throughout the whole parcel, only on the portions of the parcel affected at the time the zoning resolution was adopted, or to some area of land in between those alternatives. Essentially, we must determine which of these possibilities the legislature intended "land" in the first sentence of § 18-5-207 to refer to. Answering this question is the key to resolving this issue.

[¶31] The County's position relies on an interpretation that a nonconforming land use is confined to its boundaries at the time a new zoning resolution affecting that use is adopted. The County contends that to hold otherwise would allow a nonconforming use to expand uncontrollably to the detriment of a county's health, safety, and welfare. It provides examples of a small campground becoming a huge recreational vehicle resort site and of a small dump becoming "a multi-acre tire disposal site." These hypotheticals, however, are inapposite because they fall within a different category of land uses—land uses that can occur on any suitable parcel of land. RST correctly recognizes that, unlike those uses, a gravel operation utilizes the natural resources that comprise the land itself, i.e., the land is a diminishing asset.[4] As the Illinois Supreme Court explained in *Du Page County v. Elmhurst-Chicago Stone Co.* 165 N.E.2d 310, 313 (Ill. 1960):

> This is not the usual case of a business conducted within buildings, nor is the land held merely as a site or location whereon the enterprise can be conducted indefinitely with existing facilities. In a quarrying business the land itself is a material or resource. It constitutes a diminishing asset and is consumed in the very process of use. Under such facts the ordinary concept of use, as applied in determining the existence of a nonconforming use, must yield to the realities of the business in question and the nature of its operations.

Because of this distinction in uses, we need not concern ourselves with the kind of land uses that the County hypothetically poses.

[¶32] A review of Title 18, Chapter 5, article 2 does not yield any clues as to the legislature's intent regarding the meaning of "land" in § 18-5-207. Without any statutory guidance, we look to the common law. Other jurisdictions have commonly employed the doctrine of diminishing assets to address the unique issues pertaining to the use of land for mining and quarrying. To date, we have not addressed this doctrine. Although the

---

[4] Mineral extraction or non-gravel mining also falls within this category, but Wyo. Stat. Ann. § 18-5-201 (LexisNexis 2013) specifically limits a county's zoning authority over this type of land use. *Id.* ("However, . . . no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto.").

parties raised the doctrine of diminishing assets as a separate issue, we will address it here to resolve the ambiguity of § 18-5-207.

## A. The Doctrine of Diminishing Assets

[¶33] American Jurisprudence aptly explains the policy underlying the doctrine of diminishing assets.

> Application of the general rule that a nonconforming use may not be extended to land not so used prior to the enactment of a restrictive zoning ordinance may work a singular hardship where the use in question involves the removal of natural products from the earth. For example, quarries are particularly vulnerable because, by their very nature, they begin on one spot and spread to additional ground as the mineral reserve is exhausted. Such diminishing-asset enterprises "use" all of the land contained in a particular asset, and as a practical matter, such use must begin at one spot and continue from there to the boundary of the land. Courts, therefore, have respected the unique character of such diminishing-asset uses by permitting them to expand onto adjacent land.

83 Am. Jur. 2d *Zoning and Planning* § 569 (2014) (footnotes omitted); *see also Stephan & Sons, Inc. v. Mun. of Anchorage Zoning Bd. of Exam'rs and Appeals*, 685 P.2d 98, 101-02 (Alaska 1984) (citing 6 R. Powell, *The Law of Real Property*, ¶ 871[iii] at 79C-178 to -179 (Rohan rev. ed. 1979) ("[A]n owner of a nonconforming use may sometimes be found to have a vested right to use an entire tract even though only a portion of the tract was used when the restrictive ordinance was enacted."). Another underlying policy that we find significant is that a business by nature expands and grows over time as demand increases. *See Hansen Bros. Enter., Inc. v. Bd. of Supervisors of Nevada Cnty.*, 907 P.2d 1324, 1349 (Cal. 1996) (recognizing "that the natural and reasonable expansion of a quarry business to meet increased demand is not an impermissible enlargement or change in the use of the property").

[¶34] There appears to be a growing consensus among jurisdictions that apply the doctrine of diminishing assets to use the following three-prong test:

> First, [the land owner] must prove that excavation activities were actively being pursued when the [Ordinance] became effective; second, [the land owner] must prove that the area that he desires to excavate was clearly intended to be excavated, as measured by objective manifestations and not

by subjective intent; and, third, [the land owner] must prove that the continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood.

*Romero v. Rio Arriba County Comm'rs*, 140 NM 848, ¶ 25, 149 P.3d 945, 951 (N.M. App. 2006) (quoting *Town of Wolfeboro (Planning Bd.) v. Smith*, 556 A.2d 755, 759 (N.H. 1989)) (modifications in original); *Town of West Greenwich v. A. Cardi Realty Assocs.*, 786 A.2d 354, 363 (R.I. 2001) (adopting *Smith's* three-prong test); *see also* 83 Am. Jur. 2d *Zoning and Planning, supra*, § 569. The Board only applied the second prong of this test, but the district court applied the entire test, finding that we would likely adopt it. Both parties propose that we adopt this test but dispute its application. We review the adoption of the doctrine of diminishing assets regardless of form *de novo* and its application under the substantial evidence standard. Where applicable, we also apply the arbitrary and capricious standard.

[¶35] Because the above quoted pronouncement of the doctrine of diminishing assets provides a reasonable and objective means of quantifying "land" as used in the first sentence of § 18-5-207, furthers important policies, and considers the impact of expansion on the neighborhood, adopting this test seems to be the best way to resolve the ambiguity of § 18-5-207 in a manner consistent with legislative intent. Therefore, we hold that to define the geographic extent of a protected, nonconforming land use involving a diminishing asset under § 18-5-207, we will require that the land owner or user prove each prong of the three-prong test quoted above. In so holding, we recognize that this test is highly fact dependent and will vary from case to case, especially for the second prong. *Moore v. Bridgewater Twp.*, 173 A.2d 430, 437 (N.J. Super. App. Div. 1961) ("It is difficult, and also dangerous, to attempt to fix standards applicable in all cases; each case must be decided on its own facts."). Regarding the second prong, we do note "that excavation cannot occur simultaneously on the whole of the land." *Crumbaker v. Hunt Midwest Mining, Inc.*, 69 P.3d 601, 609 (Kan. 2003); *Elmhurst-Chicago Stone Co.*, 165 N.E.2d at 313 (noting that gravel extraction businesses "cannot operate over an entire tract at once"). Thus, "if there were evidence of an intent to expand excavation to any other portion of the land at the time the zoning laws had been implemented, expanded excavation is not considered an unlawful nonconforming use." *Crumbaker*, 69 P.3d at 609.

[¶36] The County does not dispute that RST has proved the first prong—that he was actively conducting a gravel operation at the time the County's LDRs became effective. The parties do dispute whether RST proved the second and third prongs. RST contends that the Board misinterpreted and misapplied the doctrine by restricting the size of his gravel operation to the acreage actually in use when the County's LDRs became effective in 1978. RST further contends that he presented sufficient objective evidence to establish

an intent to expand his operation to its natural limits and that the Board based its decision on improper findings of fact.

[¶37] Although the County agrees that we should adopt and apply the three-prong test, it stresses that we should do so cautiously since expansion of nonconforming uses is disfavored. The County agrees with the Board's conclusion that RST did not present sufficient objective evidence manifesting an intent to expand his gravel operation when the County's LDRs became effective in 1978. Furthermore, the County maintains that RST did not present evidence on the third prong and that the evidence in the record on this prong actually goes against RST.

[¶38] Starting with the second prong, we conclude that substantial evidence does not support the Board's conclusion that RST did not manifest intent to expand beyond three acres. To the contrary, the record contains sufficient objective evidence to demonstrate that RST did intend to expand. In their decisions, the hearing officer and the Board overemphasized the relative size of RST's operation at the time the LDRs went into effect and its determination that an expansion constitutes a change in use. This emphasis ignores the nature of a business, especially a business that utilizes a diminishing asset, to expand and grow over time as demand increases. *See Hansen Bros.*, 907 P.2d 1324, 1349 (recognizing "that the natural and reasonable expansion of a quarry business to meet increased demand is not an impermissible enlargement or change in the use of the property"). The hearing officer and the Board also relied almost exclusively on a finding that RST did not prepare, designate, or cordon off areas he intended to excavate, which, they contend, he should have done to manifest intent to expand. In essence, the Board found that because RST did not "cordon off" additional land on his ranch as designated expansion area, he necessarily did not intend to expand. Nevertheless, the hearing officer and the Board cite no authority for this conclusion nor do they point to some evidence in the record that this is common practice within the gravel extraction industry.[5] Thus, the Board's conclusion on this issue lacks a reasonable or sustainable basis to uphold it under the substantial evidence standard. Furthermore, the Board's conclusion not only fails to satisfy the substantial evidence standard, it also fails to satisfy the arbitrary and capricious standard because it lacks adequate findings of fact and conclusions of law. *Dale* ¶ 23, 188 P.3d 561.

[¶39] Another reason to reject the imposition of a requirement to prepare or cordon off future areas of expansion is that it discourages the productive use of land, which is

---

[5] One court did consider a fence as one factor (but not the sole basis) that showed objective intent, but that case involved very different circumstances that made the fence significant. *Moore v. Bridgewater Twp.*, 173 A.2d 430, 432 (N.J. Super. App. Div. 1961). In that case, the fence surrounded the perimeter of the property. *Id.* The fence was significant because the parcel at issue straddled the border of two jurisdictions and the majority of the quarrying activity took place on one side of that border. *Id.* Thus, the fence helped to demonstrate that quarrying was intended throughout the whole parcel in not just one but both jurisdictions.

contrary to Wyoming public policy. *See Hulse v. First American Title Co. of Crook Cnty.*, 2001 WY 95, ¶ 34, 33 P.3d 122, 133 (Wyo. 2001) (recognizing the public policy of furthering productive use of land as one of the public policies supporting the establishment of private roads); *see also Ferguson Ranch, Inc. v. Murray*, 811 P.2d 287, 289 (Wyo. 1991). "It is in the very nature of [gravel extraction] business that reserve areas be maintained which are left vacant or devoted to incidental uses until they are needed." *Elmhurst-Chicago Stone Co.*, 165 N.E.2d at 313.

> For practical and economical reasons [a gravel operator] must begin operations at one given point and continue from there to a point on his lands where his natural resource ends or at his boundary line. For the same reasons, it is not feasible for him to quarry at different locations at the same time.

*Township of Fairfield v. Likanchuk's, Inc.*, 644 A.2d 120, 124 (N.J. Super. Ct. App. Div. 1994). The evidence shows that RST has used the rest of the parcel for grazing cattle and has gradually extracted the areas near his current extraction sites as needed to grow his business. Additionally, in his 2010 mine permit application to the Wyoming Department of Environmental Quality, RST indicated that, to help control weeds, he would intentionally leave future extraction areas unexcavated until needed. This evidence demonstrates that RST intended to expand his gravel operation.

[¶40]   Another reason to confine a gravel operation to a smaller area for small operations like RST's is that the Wyoming Environmental Quality Act imposes a fifteen-acre limit (formerly ten-acre limit) on operations that wish to operate under the limited mining operation exemption. Wyo. Stat. Ann. § 35-11-401(e) (LexisNexis 2013). With this limited amount of acreage to work with, it makes little sense economically or practically for a gravel mine operator to have several one or two acre sites distributed throughout a larger parcel when a larger site is feasible. Similarly, confining an operation to a smaller, compact area reduces the number of roads that the operator must maintain and minimizes dust problems. Furthermore, RST's neighbors have received aesthetic benefits by the confinement of the gravel operation to certain portions of the property rather than an operation that is sprawled throughout the property. As one court has explained, "It is quite obvious that an owner intending to carry on a quarrying operation acquires more land than he thinks he will need so that he will not be a source of nuisance to his neighbors." *Township of Fairfield*, 644 A.2d at 124. Consequently, if RST's gravel operation is to occupy just a small fraction of the total parcel, it benefits himself, his land, his neighbors, and the environment to confine the operation to a smaller area rather than operating on a patchwork of work sites scattered throughout the property.

[¶41]   We also note that some cases have raised the concern that a gravel operation may try to expand without truly have intending to expand at the time the operation became a

nonconforming use. *See, e.g., Fred McDowell, Inc. v. Bd. of Adjustment of the Twp. of Wall*, 757 A.2d 822 (N.J. Super. Ct. App. Div. 2000); *Township of Fairfield*, 644 A.2d at 124-25; *Stephan & Sons*, 685 P.2d 98. Many of these cases, however, address situations where an operation expanded or sought to expand to an adjacent parcel. Since this type of situation is not before us in this case, we will not address it. Aside from those cases, the concern of unwarranted expansion, while a valid one, is resolved by requiring objective evidence to establish the intent to expand.

[¶42] We also recognize the inherent tension between the general rule of disfavoring the expansion of nonconforming uses, *Snake River Brewing Co.* ¶ 11, 39 P.3d. 404, and the expansion of certain nonconforming uses permitted by the doctrine of diminishing assets. Because of the unique nature of uses involving diminishing assets, however, the very presence of an extraction operation on a parcel inherently, but not dispositively, suggests an intention to expand on that particular parcel. The Illinois Supreme Court has gone so far as to hold that "in cases of a diminishing asset the enterprise is 'using' all that land which contains the particular asset and which constitutes an integral part of the operation, notwithstanding the fact that a particular portion may not yet be under actual excavation." *Elmhurst-Chicago Stone Co.*, 165 N.E.2d at 313. Although this position is not entirely consistent with the test we adopt today, it underscores our recognition of the practice of gravel operations to leave undisturbed areas they intend to excavate later.

[¶43] In addition to critiquing the Board's rationale, we also examined the record to see if RST did in fact carry his burden to present sufficient objective evidence manifesting his intent to expand at the time the zoning regulation went into effect. Our examination reveals that RST presented uncontroverted evidence that the Board's decision addressed inadequately. First, RST presented evidence that he began the operation with two initial excavation sites. Claudette Higgins, RST's ex-wife, and Bill Moyer both testified about the location of those two sites on different parts of the property. The 1978 aerial photograph of RST's land shows that these two sites are separated by at least several hundred feet. The separation of the sites and the distance between them points objectively toward an intent to expand throughout the parcel.

[¶44] Second, RST presented evidence that the location of his main operation is in an open area conducive to safe expansion. The aerial photos show the gravel extraction site is surrounded by open agricultural land. RST's 2010 mine application also states that the area where he conducts his gravel operation is at least 300 feet away from any neighboring properties. Initially, one of the sites was near RST's border with the Melody Ranch property. Once RST's neighbors started construction on the Melody Ranch housing development near his border, however, RST moved his operations away from that border. These facts also objectively indicate an intent to expand.

[¶45] Third, RST presented the testimony of Mr. Moyer, who testified that RST tested excavation methods in various places. Mr. Moyer also testified that from the beginning,

RST had aspirations of becoming competitive with and as big as the other gravel pits in the area. This testimony further demonstrates objectively an intent to expand.

[¶46] Finally, RST presented evidence that the income from his gravel business in the 1970s provided more of his total income than any of his other businesses. Both Ms. Higgins and RST testified that the majority of their income came from the gravel business, even before the 1978 LDRs became effective. Ms. Higgins further testified that their income from the ranching business was "skimpy" and "not good enough." She also testified that she and RST intended to make a living from the gravel business income. This intention was supported by her testimony that although the operation began small, it grew rapidly, even in the 1970s, due to increased demand. Moreover, RST increasingly spent more of his time on the gravel business than he did his other businesses. All of this evidence also supports an intent to remain in the gravel business, which would necessitate expansion. Because more than three decades have elapsed since the enactment of the County's LDRs, we recognize that RST had particular difficulty in coming forward with any other evidence on this prong.[6]

[¶47] We also highlight that the Board ratified the hearing officer's findings that the witnesses who presented this evidence were credible and that the testimony of Ms. Higgins in particular was "entitled to considerable weight." Since the burdened party's uncontested testimony that the hearing officer deems credible is sufficient to satisfy the burden of proof, the Board's disregard of this evidence in reaching its decision is troubling. *Ikenberry*, 5 P.3d at 803. Under these circumstances, we find that RST presented sufficient evidence regarding the second-prong to carry his burden by a preponderance of the evidence and that the Board's findings of fact and conclusions of law were against the great weight of that evidence.

[¶48] Finally, we consider the third prong—whether RST proved that continued operation of his gravel business does not and will not have a substantially different and adverse impact on his neighborhood. Neither the hearing officer nor the Board addressed this prong, but they also did not apply the three-prong test. Finding that we would likely adopt the proposed three-prong test, the district court concluded that there was no evidence that a continued use would not have a substantially different and adverse impact on the neighborhood. Although RST did not adequately address the third prong in his arguments, an examination of the record reveals that there is evidence regarding this prong.

[¶49] The County argues that expansion of RST's gravel operation resulted in numerous complaints, citing a 1998 DEQ inspection report and the testimony of the County's code

---

[6] We also note that, regardless of the reason, the County did not begin investigating a potential violation of its LDR's until 1995, nearly two decades after the LDR's became effective.

compliance officer Jennifer Anderson. The DEQ inspection report merely states that the "inspection was conducted in response to several calls from concerned citizens in the Jackson area who expressed concern over recent expansion of the mining operation and increased activity." The report, however, is of little value for two reasons: (1) it is nearly sixteen years old and (2) it does not explain the nature of those concerns. Ms. Anderson testified that she had received only about six calls regarding noise from RST's crusher from 2006 to 2011—an average of one call per year.[7]

[¶50] In support of RST, an internal County memo dated October 12, 1995, states that RST was willing to move his processing site to a different part of his property to help mitigate any disturbance of his neighbors and that he was willing to use some noise mitigation if necessary. RST testified that, when the Melody Ranch property—the property on his eastern border—began to be developed for residential use, he voluntarily moved his gravel crusher away from its former location near the eastern border to, in his words, "take the pressure off the Melody." When asked, RST could not recall what year development began. From our examination of the aerial photographs in the record, it appears that the portion of the Melody Ranch along RST's property did not undergo development until sometime between 2001 and 2003. This is significant in that it shows that the developers proceeded with the development even though RST had been running a gravel operation on the neighboring property for more than two decades prior. At some point, RST erected a berm between his operation and the eastern border of his property. Later, RST also erected berms around his pit and processing site to help mitigate any disturbance of his neighbors.

[¶51] As we consider this prong, we also note that the Wyoming Environmental Quality Act ("EQA") contains provisions to help prevent a gravel operation from having a substantially different or adverse impact on its neighborhood. For instance, a mining operation must be setback a minimum of 300 feet from "any existing occupied dwelling, home, public building, school, church, community or institutional building, park or cemetery unless the landowner's consent has been obtained." Wyo. Stat. Ann. §§ 35-11-401(e)(vi)(A), 35-11-406(m)(viii) (LexisNexis 2013). Furthermore, RST's operation currently occupies the maximum acreage allowed under the former limits of the EQA's limited mining exception, precluding further expansion without permission from the DEQ.[8] § 35-11-401. The permitting process requires RST to notify his neighbors and the local community of his expansion plans. § 35-11-406(g)(j). An interested person can potentially trigger a contested case hearing by objecting to the proposed expansion.

---

[7] We note, however, that RST and Mr. Moyer testified undisputedly that a screener makes more noise than a crusher.

[8] In 2013 the legislature amended this section to permit limited mining operations to occupy up to fifteen acres of disturbed land. The issue of whether RST may now expand up to fifteen acres under the limited mining exception is not before us.

20

Thus, the EQA provides a mechanism for determining whether an expanded gravel operation will have a substantially different and adverse impact on the neighborhood.

[¶52] Taking all of this into consideration, the expansion of RST's operation has not had a substantially different and adverse impact on his neighborhood. This is particularly true for most of RST's neighbors, since they did not become his neighbors until years after RST had established and expanded his operation. Therefore, we find that RST has carried his burden on the third prong of the test by a preponderance of the evidence.

[¶53] Having examined the record, the Board's decision, and the applicable law, we hold that the Board's decision regarding the application of the doctrine of diminishing assets lacks substantial evidence to support it and is arbitrary and capricious. We further hold that RST carried his burden by a preponderance of the evidence by demonstrating: (1) that he objectively manifested an intent to expand his gravel operation on his 300-acre parcel at the time the County's LDRs became effective in 1978, and (2) that continued operation of his gravel business will not have a substantially different and adverse effect on his neighborhood. Therefore, under § 18-5-207 RST has a vested right to expand his gravel operation on the 300-acre parcel on which the operation is located without unauthorized regulatory interference from the County, provided that he complies with other applicable laws, such as the EQA and the DEQ's regulations. Accordingly, we hold invalid the portions of the Board's Order that require RST to reduce the size of his operation to three acres and that limit his extraction volume to not more than 15,000 cubic yards or 17,000 tons per year.

## I.   The DEQ's and the County's Roles in Regulating Gravel Mining Operations

[¶54] The next issue for our consideration is determining to what extent, if any, that counties may regulate gravel mining operations that are already subject to DEQ regulation under the EQA. RST asserts that the Board's order is an improper exercise of authority that conflicts with DEQ's regulatory authority over his operation under the EQA. In support, he maintains that, since counties are political subdivisions of the state, they only have the powers that the state grants them. Next, he details the EQA's requirements that apply to his gravel operation and contends that they are comprehensive, precluding the County from regulating bonding, reclamation, or expansion.

[¶55] The County argues that, consistent with our holding in *River Springs*, the EQA permits counties to regulate mining operations as long as the county's regulation does not prohibit all mining and does not conflict with DEQ regulations. The County further contends that the EQA also permits counties to exercise their regulatory role to advise the DEQ of the scope and nature of any applicable grandfathered rights. Because it relies on the Board's and district court's holdings regarding the construction of the zoning statutes and the application of the doctrine of diminishing assets, the County contends that both

itself and the DEQ have separate regulatory authority over different acres and different aspects of RST's gravel operation.

[¶56] This is a question of law that we review *de novo*. Because we held that the size restriction and the limits on extraction volume of the Board's order are invalid, the reclamation and bonding requirements are the only remaining aspects of the Board's Order that RST contests.

[¶57] We have addressed this issue before. In *River Springs*, we noted that the State has granted both DEQ and the County authority to regulate gravel mines through their respective statutory provisions. 899 P.2d at 1335-36; Wyo. Stat. Ann. §§ 18-5-201 through 208; 35-11-401 *et seq.* (LexisNexis 2013). Accordingly, "our task is to harmonize the several statutory provisions and endeavor to afford legitimate effect to all of them," leaving us with "no occasion to invoke the doctrine of preemption." *River Springs*, 899 P.2d at 1335. The County's regulatory authority is limited by the authority granted to the DEQ because counties have "no sovereign power other than that granted by the legislature." *River Springs*, 899 P.2d at 1335-36. Thus, the County may only regulate in a manner that does not conflict with or duplicate DEQ regulations properly promulgated under the EQA. *Id.* at 1336. As we discussed above, the County's regulatory authority is further limited to regulations that "promote the public health, safety, morals and general welfare of the county." § 18-5-201. Moreover, the County may not regulate in a manner inconsistent with § 18-5-207 such that the nonconforming use can no longer continue. *Snake River Brewing Co.*, ¶ 10, 39 P.3d 403.

[¶58] Although the EQA generally requires a mining operation to obtain a permit from the DEQ, the limited mining exception of the EQA exempts qualifying mining operations from the permit requirement if they comply with certain other requirements. Wyo. Stat. Ann. § 35-11-401(e)(vi)(k) (LexisNexis 2013). For nearly twenty years, RST has operated his gravel business under the limited mining exception. Thus, to resolve this issue as it currently stands, we need only consider the portions of the EQA that set forth the limited mining exception. The limited mining exception's ongoing regulations can be summarized as requiring an operator to comply with setback requirements, bonding requirements, reclamation requirements, and annual reporting requirements. *Id.* Clearly, the requirements of the Board's Order pertaining to bonding and reclamation duplicate and conflict with the DEQ's regulatory authority. Because of our decision regarding expansion, the County's argument that it has regulatory authority over different acres and different aspects of RST's gravel operation fails. Thus, the County has no basis for imposing bonding and reclamation requirements on RST's gravel operation. *River Springs*, 899 P.2d at 1336; *see also Ahearn v. Town of Wheatland*, 2002 WY 12, ¶ 14, 39 P.3d 409, 415 (Wyo. 2002) (holding that "the general grant of power to municipalities to adopt zoning laws in the interest of public welfare does not permit the local governing

22

bodies to override the state law and the policies supporting it"). Accordingly, we hold that the bonding and reclamation requirements of the Board's Order are void.[9]

## II. *Laches*

[¶59] The final issue that RST raises is whether the County's enforcement action is barred by laches. RST contends that the County should be barred from enforcing its LDRs against him because they failed to do so for nearly twenty years after the 1978 LDRs became effective. He claims that the evidence in the record demonstrates that his operation was clearly visible from a major county road and that the County had bought gravel from him. Consequently, RST argues that the County's actions and failure to enforce its LDRs induced him to believe that his operation was legal and that he could expand his operation. The County asserts that laches is not applicable to a governmental entity when it is enforcing a public or governmental right. Furthermore, the County notes that the Board found the evidence insufficient to establish that the County had bought gravel from RST. Accordingly, the County maintains that RST failed to establish that the County committed an affirmative act of misconduct.

[¶60] The standard of review for the defense of laches is abuse of discretion. *Cathcart v. Meyer*, 2004 WY 49, ¶ 13, 88 P.3d 1050, 1058 (Wyo. 2004). "Laches is defined as such delay in enforcing one's rights that it works to the disadvantage of another." *Thompson v. Bd. of Cnty. Comm'rs of the Cnty. of Sublette*, 2001 WY 108, ¶ 17, 34 P.3d 278, 282 (Wyo. 2001). A party asserting laches must establish two elements: (1) inexcusable delay and (2) injury, prejudice, or disadvantage to the defendants or others. *Id.*

[¶61] The second element is dispositive. RST has not established that he has suffered injury, prejudice, or disadvantage. This is particularly true since we hold in his favor on the preceding two issues. Even if we had not, however, RST has been able to conduct his business for nearly twenty years without interference from the County. Since the County began investigating his gravel operation, he has been able to continue to operate up until now. Therefore, we find that RST has failed to establish the defense of laches.

## CONCLUSION

[¶62] Our review of this case leads us to conclude that the Board's Order was an improper agency determination and exercise of authority except for the uncontested

---

[9] We note, however, that RST has applied for a permit that would allow him to expand beyond the ten acres his operation currently occupies. The regulatory scheme for mining operations operating under permit is more extensive than the scheme for the limited mining exception. Thus, applying the same analysis from *River Springs, Ltd. Liability Co. v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 899 P.2d 1329 (Wyo. 1995), any other regulations that the County may attempt to impose on RST may not conflict with the additional EQA regulations that would apply to RST's operation if he receives a permit.

regulation pertaining to hours of operation.  To summarize our holdings, § 18-5-207 is ambiguous regarding the extent of its protection of nonconforming land uses.  To resolve this ambiguity, we adopt the three-prong test of the doctrine of diminishing assets.  The application of the three-prong test to this case reveals that RST may expand his gravel operation on the parcel on which it lies to the extent that it complies with the requirements of the EQA and its accompanying regulations.  This protection also precludes the County from limiting the volume of gravel extracted.  Moreover, the bonding and reclamation requirements of the Board's Order duplicate and conflict with the regulatory authority of the DEQ under the EQA and are thus invalid.  Finally, RST failed to establish the defense of laches.  We reverse and remand for further proceedings in accordance with this opinion.